MARION E. SILVIUS, Appellee, v. DOUGLASS DEREMORE and LUCY C. DEREMORE, Appellants.

**Real property:** CONTRACT OF EXCHANGE: FALSE REPRESENTATIONS. One making a personal examination of land before accepting a proposition to exchange for same, and who knew it would require a substantial outlay for drainage to protect the land from overflow from a particular stream, is not entitled to damages on the ground of false representations concerning the amount of land subject to overflow from that stream.

*Appeal from Fremont District Court.*—HON. A. B. THORNELL, Judge.

THURSDAY, APRIL 6, 1911.

ACTION to foreclose a mortgage. The defendants admitted the note and mortgage, but interposed a counterclaim for damages for false representations. There was a trial to the court and a decree for plaintiff for the full amount of his mortgage and dismissing the counterclaim. The defendants have appealed. *Affirmed.*

*M. J. Wade,* for appellants.

*W. E. Mitchell,* for appellee.

EVANS, J.—The plaintiff is a resident of South Dakota, and the defendant a lawyer of Waukon, Iowa. On July 27, 1906, they entered into a contract for the exchange of their respective equities in certain incumbered lands. Under this contract the defendant was to pay to the plaintiff a difference or "boot" of $5,500. For this sum the defendant executed to the plaintiff his note and mortgage covering the land purchased by him from the plaintiff. This is the note and mortgage now included in the plaintiff's foreclosure, and the land covered thereby is the subject of the alleged false representations of which defendant complains in his counterclaim. The land so covered consists of a farm of nine hundred and eighty-three and one-half acres, located on the Missouri river bottoms in Fremont county, and contains considerable improvements. The complaint of defendant is that the plaintiff represented to him, in substance, that the farm was first class and capable of raising ninety bushels of corn to the acre and worth from $60 to $75 per acre; whereas, in truth, the farm was low and flat and subject to overflow and was worth much less than the amount stated.

Prior to the negotiations for the exchange, the parties were strangers to each other, and their preliminary negotiations were carried on in the main by correspondence. The plaintiff desired to sell this farm in question subject to a mortgage thereon of $25,000. The defendant was the owner of equities in four thousand acres or more of Minnesota land, most of which he held under contract from a railroad company and from the University, and which was incumbered by mortgages and unpaid purchase money for nearly $26,000. For the most part they were cheap unimproved lands. After a tentative proposition had been made by the plaintiff, the defendant went to Fremont county in company with the plaintiff to see the

land in question. He arrived there on July 25 and spent portions of three days in an examination of the land and in various inquiries concerning the same. At the expiration of that time the tentative proposition was accepted, and the contract was executed. On the east side of this land are large bluffs covering a considerable area. Out of these bluffs comes "Plum creek," which has a deep channel until it strikes the level lands on the bottoms. When it reaches the level lands it loses its bank and ceases to have a channel, and the waters thereof spread over a large acreage of the level lands and pass gradually to the south and west toward the Missouri river. The availability of much of this land for farming purposes depends upon the quantity of water which should be discharged upon it from Plum creek, and this, of course, depends upon the degree of rainfall at the given time. The drainage problem presented by this farm is to confine the waters of Plum creek to a channel either by digging a ditch or by building dikes and thus to prevent their spread over a large acreage.

The appellant was a witness in his own behalf and testified with commendable candor. From an examination of his testimony, we can not avoid the conclusion that he fully understood that he would have to incur a substantial expense in the adoption of some drainage project which would protect his farm from overflow from this particular source. He doubtless did not foresee the extent of the floods which were cast upon him in the succeeding two seasons. The following excerpts from his testimony are sufficient to indicate the knowledge which he did acquire in his investigations:

We came back to the willow grove and walked down south perhaps one hundred and fifty rods. There was a place there where the water was running through a little dike or ditch, and Silvius said: "We don't go any farther than this." We got to the place where there was a

break in the dike or ditch. Q. Was the dike in this land
or on the adjoining land? A. It was right in the middle
of this land, right on the section, between sections 3 and
4 and sections 9 and 10 in the middle of the land. . . .
We three walked over to the east side of the place. There
had been a heavy rain perhaps a week or ten days, some-
thing like that, before this, and the water had broken
through the place on the Fugit·land and had washed down
the corn on this land. Silvius said: 'That thing will
never happen again. That Fugit will have that re-
paired.' Q. Was that a dike? A. It was a bank, and
more of a cut in the bank. It probably had been filled in
some time, but it was probably a natural bank. He said
that Fugit will fill that up, and we will never have any
more trouble on account of the break. . . . We walked
south to where there was a bridge where a creek had run
some time before, and the creek then was taking a south-
westerly course. There had been an embankment thrown
up to evidently protect the land to the north of it from
the water of Plum creek. Silvius told me that some former
landowner had given permission to Fugit to go on that
land and throw up that embankment upon the condition
that he kept that bank or dike so that it would protect the
land north of it from the flood and it did not do it. He
says to me: 'Now, as you are a lawyer, is not he liable
for damages?' . . . This place was at about the south-
east corner of the land in section 3. He also asked me
at the same time whether Fugit had a right to throw up
an embankment on the east side of the creek running
through his land, through the Fugit land. Those were
his two elements of damage, and he wanted me to tell
him whether Fugit would not be liable. We walked down
south then to where Fugit had been feeding some cattle,
perhaps one hundred rods south of where he had been
feeding cattle, and he showed me evidence of the place
where the creek had run out at some time. He again made
the same statement to me that he had made before dinner,
that, 'We won't go any farther; we will have Briley
hitch up the team and drive you over the south part of
the land.' We went back up to Plum creek, and we
walked up Plum creek to where the break had been in
the Fugit land; that is, the break as I saw it. There was

also another break through the Fugit land that that flood did not show any trace of, but it was plainly there, but Silvius said nothing to me about that break, and that break in the bank of the creek is the place that has been destroying the crops ever since I have owned the land, but Silvius said nothing whatever to me about that, and I knew nothing about that break farther up. . . . He said that the only trouble with the land is that the rain has filled in those small ditches running through the land on section 3, and the small ditches that had run down through on the section line, and that as soon as they cleaned those out that the land would be all right. . . . I think Mr. Mitchell said, 'After you get the water off of that land you will have a paradise.' . . .

When we went into Thurman on the 26th day of July, 1906, I do not remember whether we crossed Plum creek or not. We were north of the creek and not south of the creek at any time that morning. I saw Plum creek while I was on the way to Thurman. There was a gorge at Thurman, or a ditch that was probably fifteen feet deep and from twenty to thirty feet wide. I knew that east of this land there was a watershed. I could see the bluffs from this land, and that the water must have come from the bluffs onto this land. The bluffs and watershed were east of the Missouri river bottom. · I think when we got through the hills to Sidney we came by Knox. I think I noticed that all of the streams I passed coming from Knox up this way were headed toward the Missouri river bottoms, and as we came through Thurman and across these ravines, in and out of the bluffs we saw this watershed headed toward the Missouri river bottom. . . . I could not tell· anything about the lay of the land by looking at it. As far as I could see, it looked perfectly level. It looked the same as any other flat land. . . . Plum creek cut off the southeast corner of section 3. There was a definite ditch along there on the southwest for probably a hundred yards, when I was there the first time. There had been grading done there on the east side. From the southeast corner of the land in section 3 it was perhaps a hundred rods south along the ditch where there had been grading done or dikes thrown up. With reference to the point, the southeast corner of section 3, there were

dikes or levees thrown up south or southwest of that point to the west and north of the creek. From the old place where the creek had run, where there had been a dike thrown up, was from one to twenty rods farther east. I knew it was up as a defense against the water. On the Fugit side of the creek from the southwest corner of section 3 and on the west side there was a dike, but it had been washed away. It was about one hundred rods from the southeast corner of the land in section 3. At that time I knew there had been somewhat of a crop, but last year there was no crop at all. . . . When I came to Briley's house I went west of the house. I knew that Plum creek touches the southeast corner of the land in section 3, or did at that time. I am not certain whether it does now or not. Beginning at the corner of the land in section 3 and running in a southerly direction bearing a little to the west, when I was there, there was an old levee there partly washed away. It was broken in places. It was probably twenty rods from the southeast corner of section 3. It was broken in one place, I think the length of this courtroom. There was a large break farther down, several hundred feet further down the creek, and the water had cut the levee down to the bottom of the creek. This was on the 25th day of July, 1906. . . . The day I was out on this farm at the southeast corner of the southwest quarter of section 3, I remember seeing logs washed down. They may have been a foot in diameter. Don't remember whether I saw any stumps or not. There was a lot of debris in the track of high or flood water. I knew there must have been timber land somewhere that this creek drained.

The contract itself contained the following stipulation: "It is stipulated that all crops on the premises hereinbefore described for the year 1906 shall belong to the party of the first part; and it is further stipulated that the first party may, without any expense to the second party, do such things with reference to the creek and the overflow of water to preserve the crop as he may deem expedient, and further stipulated that the first party assigns all claims for damages by reason of the dominant

landowner having caused water to overflow the premises hereinbefore described."

The defendant also understood that at some previous time a petition had been filed with the county auditor proposing a drainage district. He went to the office of the county auditor and made some inquiries there as to the probable cost of such a ditch to adjacent landowners. On that subject he testified as follows:

I thought that the outside cost of the ditch would be $5 an acre, or for the nine hundred and eighty-three and one-half acres of land about $5,000. I thought that that would be the limit. I knew that the land was in the path of Plum creek, but did not know it was anywhere near as bad as it is, and I thought there was plenty of fall; whereas, there is not. I knew that the Cole land would have been in the district, if a ditch as talked of had been built; but I did not know that any of the ditch would go through the Cole land. I supposed that the land in the drainage district would be taxed in proportion to the benefits received from the ditch. I thought that all of the Cole land would be taxed for the construction of the ditch, and I thought that the limit per acre would be about $5. Mr. Webster and I made an examination of the Nishnabotna Creek Ditch in the auditor's office. I don't remember whether we made any examination upon the proposed Plum Creek Ditch. We did not find it to be a fact that there was a very flat grade, and that in a long distance the banks would have to be made high to carry the water on the top of the ground instead of in the ground. To the best of my recollection, we made no investigation of the Plum Creek Ditch. I went to the auditor's office to ascertain what the cost had been of the Nishnabotna Ditch. I was concerned about the Nishnabotna Ditch because you (meaning Mr. Mitchell) told me I could form an estimation of what the cost of the Plum Creek Ditch would be from that. You did not say to me that I could find the report of the engineer showing the amount of the cost of the ditch as he reported it. I knew nothing about drainage matters as a lawyer or as an individual.

It is urged by appellant that Silvius represented to him that there was eight or ten feet of fall from this land to McCartney's land about a mile and a half or two miles south therefrom. This is denied by Silvius. Concededly the land appeared to the eye to be absolutely level. It is not claimed that Silvius professed to have run any levels. There is in fact a fall of about thirteen inches to the mile in that direction. Silvius himself had only owned the land since March preceding, although he had had some acquaintance with it for a year or two. He had held a junior mortgage thereon, and he purchased it at execution sale to protect his mortgage and at a cost to him of nearly $50,000. The transaction under consideration proved to be a great misfortune to appellant. This arose largely out of the fact that the seasons of 1907 and 1908 proved to be very wet seasons. It is doubtless true, also, that the successful drainage of this tract presented a very difficult problem. But it can not fairly be said that the appellee was guilty of any actionable wrong to the appellant. Such was the view of the trial court, and its decree must be affirmed.

After the beginning of the action and before the trial thereof in 1909, the parties entered into a stipulation whereby a receiver was to be appointed and was to take possession of the farm for the year 1910.

Whether a supersedeas bond was filed by the appellant, or whether there has been an execution sale and a satisfaction thereby of plaintiff's judgment, does not appear in the record before us. Notwithstanding the affirmance, therefore, the case will be remanded to the lower court to deal with the report of the receiver and the application of funds in his hands. *Affirmed.*